Alexander Berman, J.
This is a CPLR article 78 proceeding in which petitioners seek to overturn a directive of respondent which prohibits John Colombo, Jr., one of the petitioners, from "participating in contact sports on behalf of H. Frank Carey School,” on the ground that respondent’s refusal is "arbitrary, capricious and contrary to law.” The petitioners are John Colombo, Jr., 15 years of age, a student at H. Frank Carey School under the jurisdiction of Sewanhaka Central High School, and his parents, John Colombo, Sr., and Dolores Colombo.
On December 11, 1975, Dr. Nathan Samuels, the duly designated medical officer for the school district, conducted a physical examination of the petitioner, John, Jr., to determine whether he should be permitted to participate in contact sports in the high school. This examination was conducted pursuant to regulations of the Commissioner of Education of the State of New York (8 NYCRR 135.4 [c] [7] [i] [h]), the text of which follows: "It should be the duty of trustees and boards of education * * * (h) to provide adequate health examinations before participation in strenuous activity and periodically throughout the season as necessary, and to permit no pupil to participate in such activity without the approval of the school medical officer”. (Emphasis supplied.)
The physical examination disclosed no abnormality other than a marked hearing deficiency, which petitioners concede, to wit: that John is totally deaf in his right ear and that he has a 50% loss of hearing in his left ear. This hearing problem has existed from birth. He wears a hearing aid in his left ear.
Dr. Samuels, in his written report of said examination, as well as in his testimony given at the trial, stated that with his hearing aid, John could hear normal conversational tones when looking at him, but not when facing away, and that "there is a marked impairment of hearing when he clicked his fingers on the right or left side of John’s head,” and that even with loud finger clicking, there was "impairment in determining the directional source of the sound.” By reason of this hearing deficit, Dr. Samuels determined that John should not be permitted to play football, lacrosse or soccer. He rational *50 ized that John’s hearing deficit leaves him with a permanent "auditory blind” right side and a diminished sound perception on his left side, even with the use of the hearing aid, and that "this inability to directionalize the source of sound leaves him at increased risk of bodily harm as compared with students with a full sensory perception.”
In reaching the conclusion that John should not be permitted to play such contact sports, Dr. Samuels, among other things, took into consideration guidelines published by the American Medical Association (Rev ed, 1972), entitled, A Guide for Medical Evaluation of Candidates for School Sports (AMA Guide), which has been approved by the State Education Department. This guide lists, among others, as disqualifying conditions for participation in contact sports "significant impairment” of ears.
Petitioners contend, however, that Dr. Samuels had not taken into consideration other relevant factors which should have been weighed in his evaluation, such as: that both parents had given their unqualified consent to John’s participation in these sports; that John is an all-around athlete of unusual and extraordinary talent; that John has demonstrated his ability to participate extensively in contact sports with his peers who had no hearing disability and that he had never sustained any injury during such competition; that he has actually played football with nonschool organizations under the strict supervision of organized athletic groups; and furthermore, that the prohibition against participation in these high school sports has had a damaging psychological effect upon this boy in that he has now lost interest in attending school and has been made to feel inferior to and different from the other children in school.
Both parents, it is true, not only joined in this petition, but testified that they were willing to assume the risk of additional injury to their son, even if same resulted in his becoming totally deaf. John’s mother testified that another of her children, a daughter, is, in fact, totally deaf and although she would hope that John would not sustain such complete impairment of hearing, she believed that he could "live with it,” and that he would, nevertheless, be able to function well "with such a handicap.” John’s father reiterated these feelings and added that he hoped John would be able to eventually obtain a college football scholarship as this would be of vital importance because of their limited financial resources.
*51 Petitioners presented as a witness, one Gerald M. Jordan, the Assistant Director of Admissions of Gallaudet College of Washington, D. C. This is a liberal arts college for deaf students, with a student body of approximately 1,200 from the United States and foreign countries. Mr. Jordan is also President of the International Committee of Silent Sports which he referred to as the "Deaf Olympics.” This committee was founded in 1924 to provide sports for deaf people. He testified that between 1,200 and 1,800 deaf athletes participated in the Deaf Olympics, of which about 700 participated in contact sports and that he had never heard of any participant sustaining any injury brought about by reason of his affliction. He also stated that there were 59 residential primary and secondary schools for the deaf in this Country and that they all participated in contact sports. At Gallaudet, he stated, its football team competed with those of other colleges and that, as far as he knew, no injury came about by reason of any hearing impairment.
Another witness for petitioners was Sister Loyola Marie of St. Joseph’s Convent in Brentwood. She works for Catholic Charities and the Caritas Center for the Deaf. She is also formerly superintendent of two State schools for the deaf. She holds a masters degree in deaf education. She testified that the children at these institutions engage in contact sports and that these children experienced no problems or injuries during such activities, by reason of their deafness.
Bernard J. Sellick, father of two boys who had an 80% hearing loss, testified in behalf of petitioners that his two sons played contact sports, including football, and neither one of them suffered any injury attributable to his loss of hearing.
Dr. Donald T. Kasprzak, a physician who is medical officer for an up-State school district, and also Chairman of the Committee on the Medical Aspects of Sports of the Medical Society of New York, testified for the petitioners that in his opinion John should be permitted to engage in contact sports and he envisioned no danger to John or to any other students by reason of John’s affliction. He expressed the opinion that prohibiting John from engaging in contact sports was emotionally harmful to him and that there was no valid reason to anticipate aggravation of his hearing impairment by participation in contact sports. He also testified that he believed that the AMA guidelines were archaic and should be revised to *52 eliminate or substantially change the disqualifying factors listed in this guide.
Attached to the petition in this proceeding is the text of a letter to Dr. Samuels from Dr. Elliott Greenfield, otologist, of the Hearing and Speech Center of Long Island Jewish-Hillside Medical Center, in which this doctor said, "This letter serves to advise you that John can participate in contact sports if he wears a helmet that protects his ears and in all other sports activities.” However, in response to a later inquiry by Dr. Samuels, Dr. Greenfield then wrote a letter dated December 11, 1975, a copy of same being attached to respondent’s answer, which, he said, would "serve to clear my attitude toward the participation in sports of persons with sensory neural hearing losses.” In this letter he states, "however, in a person with satisfactory hearing in only one ear, even a relatively small risk is unacceptable because the individual who receives an injury to his one good ear is likely then to have no satisfactory hearing and to suffer a disabling handicap.” The letter continues: "Persons with unilateral sensory neural hearing losses, also have an impairment in their ability to determine direction from which sounds originate. Thus, these persons are likely to be handicapped in protecting themselves in certain contact sports, and therefore have an increased risk of bodily injury. For this reason, at least for certain sports such as football and basketball, I would concur with the Committee of the Medical Aspects of Sports of the American Medical Association which recommends that students b¿ disqualified from participation in contact sports who have significant impairment of hearing.”
Dr. Samuels’ medical judgment with regard to the effect of trauma upon hearing is amply supported by medical authority. Several excerpts follow from a recognized text, Attorneys’ Text Book of Medicine, by Roscoe N. Gray, M.D.[1] (3d ed, 1976, vol 3-A, pars 84A.20, 84A.21), follows:
"Lesions of the external ear. — Most cases in which impaired hearing is due to a lesion of the external ear are caused by trauma or infection. * * *
"Middle ear hypoacusis.[2] — Middle ear hypoacusis may be caused by a number of different forms of trauma. The drum-head may be ruptured by a blow to the ear * * * A severe *53 jarring of the head * * * may dislocate the ossicular chain and result in impairment of hearing. * * *
"Sensorineural hearing loss. — Blows to the head ears or both, with or without skull fracture can result in sensorineural hearing loss. * * *
"Preexisting disease and trauma. — A person with impaired hearing is at a disadvantage in life and the presence of the condition makes him more vulnerable to trauma than a normal person because he is less aware of his surroundings.” (Emphasis added.)
It is thus abundantly clear that there are at least conflicting views with respect to whether John’s participation in contact sports represents a danger to his physical well-being or to the safety of other students with whom he might participate in such games. A determination of an administrative body, made on a rational basis, should not be judicially set aside. " 'The courts cannot interfere unless there is no rational basis for the exercise of discretion or the action complained of is "arbitrary and capricious”. (Cohen and Karger, Powers of the New York Court of Appeals, pp. 460-461; see, also, 8 Weinstein-Korn-Miller, N. Y. Civ. Prac., par. 7803.04 et seq.; 1 N. Y. Jur. Administrative Law, §§ 177, 184; Matter of Colton v. Berman, 21 N Y 2d 322, 329).’ ” (Matter of Pell v Board of Educ., 34 NY2d 222, 223.)
The term arbitrary or capricious, standing by itself, makes it plain that only a narrow review of the school board’s directive is available to the courts, since it is not the function of the court to substitute its judgment for that of the administrative body, in this case, the school district.
Reported decisions of the Commissioner of Education of the State of New York, and of the courts disclose great reluctance to interfere with the judgment of a doctor-advised directive. "In cases where a diversity of medical opinion exists, it is well settled that a school district may rely on the opinion of its own physician.” (Matter of Harrington, decision of Comr of Educ, No. 9058, Aug. 4, 1975.) In a prior decision of the commissioner, dated November 15, 1972, he held: "A board of education has the responsibility to act [on the advice of its physician] in the best interest of the pupil * * * This is true even when the pupil and his parents may be willing to undertake [and indemnify the board against] a particular risk.” (Matter of Spitaleri v Board of Educ. 12 Ed Dept Rep 84, 86.) This latter decision was later upheld by the court in *54 Matter of Spitaleri v Nyquist (74 Misc 2d 811, 812) in which the court said: "Clearly, the concern of the AMA and of the school physician as well as those physicians who hold to the view that he should be permitted to play, is the always present danger of injury to the remaining organ which, if it should occur, would result in irreversible and permanent injury.”
The only case wherein the decision of the school medical. director was overturned, strangely enough, involves this same school district. However, the facts of that case were substantially different, for the remaining organ (a testicle) could very well be substantially protected by a proper guard. Furthermore, even if minimal risk remained, this could not endanger other participants, nor could it cause any risk of injury to other parts of this student’s body. The court there said: "An exercise of discretion cannot be based merely on the nature of the disability, i.e., the fact that one of a paired organ is missing. The loss of one testicle is not comparable to the loss of one of other paired organs such as eyes, ears or kidneys. The disability which results from the loss of one eye is functional in terms of participation in athletics. Lack of depth perception can increase the risk of further injury not only to the remaining sight, but to other. parts of the body. The inability to hear strongly directional sounds on the impaired hearing side could have similar consequences in some sports. ” (Matter of Prendergast v Sewanhaka Cent. High School, Dist. No. 2, Sup Ct, Nassau County, May 14, 1975 [Mr. Justice Suozzi]; emphasis supplied.)
The court recognizes the psychological factors involved in the denial to John of the right to participate in contact sports and, indeed, has great concern for and sympathy with his plight. However, the medical determination of Dr. Samuels, the court finds, was a valid exercise of judgment and was not arbitrary or capricious since: (a) there exists the risk of danger of injury to the ear in which there is only partial hearing and to which further injury could result in irreversible and permanent damage — in this case, total deafness; (b) aside from the risk of injury to his partially good ear, there also exists the possibility of injury to oiher parts of John’s body by reason of his failure to perceive the direction of sound; and (c) there is the possibility of risk of injury to other participants. Even though these risks may all be minimal, in this court’s opinion it is sound judgment for the school district to follow the advice *55 of its own medical director and the AMA Guide and prohibit John from participating in contact sports.
Respondent is entitled to judgment in its favor dismissing this proceeding.

. Surgical Director Emeritus, Aetna Casualty & Surety Co.

. Hypoacusis — reduction in ability to preceive sound, hearing impairment.